UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

IN RE:

Nayla Chanto, a/k/a Nayla Blesich,

Debtor(s).

C/A No. 25-00403-jd

Chapter 13

ORDER DENYING MOTION TO EXTEND TIME TO FILE SCHEDULES AND STATEMENTS, DENYING MOTION TO EXTEND THE AUTOMATIC STAY, AND DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND OTHER RELIEF

**THIS MATTER** came before the Court for a hearing on the Motion to Extend Automatic Stay,[1] the Second Motion to Extend Time to File Schedules and Statements ("Motion to Extend Time"),[2] and the Emergency Motion for Temporary Restraining Order and Request for Expedited Hearing ("Motion for TRO")[3] filed by Nayla Chanto ("Debtor"). Debtor seeks to extend time to file documents in this case and to extend the automatic stay as to all creditors pursuant to 11 U.S.C. § 362(c)(3). The Motion for TRO seeks enforcement of the automatic stay, a determination that the automatic stay was violated, an order for Debtor's release from incarceration, a request for a temporary restraining order, and damages.

**FINDINGS OF FACT**

Debtor filed a voluntary petition under chapter 13 of the Bankruptcy Code on February 3, 2025 ("Current Case").[4] Debtor is proceeding *pro se* in the Current Case. The petition was filed

---

[1] ECF No. 18; Amended at ECF No. 26. Unless otherwise noted, all references to the docket will refer to the Current Case.
[2] ECF No. 36.
[3] ECF No. 38.
[4] ECF No. 1.

1

without schedules or statements. The Notice of Chapter 13 Bankruptcy Case[5] was served on several parties - including the Charleston County Department of Social Services ("DSS"), Gregory S. Forman, P.C., and the Law Office of Tasha J. Kotz, LLC - but there is a question as to whether Nikola Blesich (the "DSO Recipient") received notice of the bankruptcy filing.

The Current Case is the third filed by Debtor within a two-year period. Her first case, 23-02585, (the "First Case") was filed under chapter 13 on August 28, 2023, with the assistance of counsel.[6] The First Case was voluntarily converted to one under chapter 7 on November 6, 2023,[7] and despite the subsequent withdrawal of counsel,[8] Debtor successfully obtained a discharge on March 11, 2024.[9] Because she received a chapter 7 discharge within four years of filing this case, Debtor is not eligible for a chapter 13 discharge in the Current Case.[10]

Debtor attempted another reorganization under Chapter 13 with her second case, 24-03820, (the "Second Case") filed *pro se* on October 24, 2024.[11] Debtor filed two Motions to extend the deadline to file schedules and statements,[12] arguing that she was seeking legal counsel to assist with preparation of the documents. Both requests were granted.[13] Debtor eventually filed some, but not all, of the required schedules and statements.[14] Trustee moved for dismissal under 11 U.S.C. § 521(i)(2)[15] when Debtor's filing deficiencies were not cured by the 45th day after the petition was filed. The Court dismissed the case under § 521(i)(2) on December 11, 2024.[16] Debtor

---

[5] ECF No. 4.
[6] ECF No. 1 of the First Case.
[7] ECF No. 24 of the First Case.
[8] ECF No. 46 of the First Case.
[9] ECF No. 58 of the First Case.
[10] *See* 11 U.S.C.A. § 1328(f)(1).
[11] ECF No. 1 of the Second Case.
[12] ECF No. 21 of the Second Case; ECF No. 25 of the Second Case.
[13] ECF No. 22 of the Second Case; ECF No. 26 of the Second Case.
[14] ECF No. 29 of the Second Case; ECF No. 35 of the Second Case.
[15] ECF No. 32 of the Second Case.
[16] ECF No. 33 of the Second Case.

filed a Motion for reconsideration of the Order Dismissing Case on December 18, 2024.[17] A hearing was scheduled for January 15, 2025.[18] The Motion to Reconsider was denied at the hearing and an Order to that effect was entered on January 16, 2025, leaving this Court's Order Dismissing Case in place and effective as of the date it was entered.[19]

Debtor was then incarcerated pursuant to an Order of the family court ("First Family Court Order") entered on January 10, 2025, for hearings that occurred after the Second Case was dismissed.[20] The First Family Court Order found Debtor engaged in contemptable conduct including: purposefully evading service, failing to take action required by an order, making selective financial disclosures, failing to make payments required by various orders, and engaging in other conduct to increase the expense of the proceeding.[21] The First Family Court Order held Debtor in civil contempt of four prior family court orders and sentenced her to 10 days incarceration on one rule to show cause concurrent with incarceration for up to six months for three other rules to show cause.[22] It provides Debtor with the option to purge the contempt by paying a total of $16,670, representing costs owed under various orders, and further Ordered that if the balance is not paid during the incarceration, then Debtor will pay the remaining balance at $1,000.00 per month beginning the month after she is released.

On February 6, 2025, three days after the Current Case was filed, Debtor moved in the family court for *Ex Parte* Relief from Incarceration ("Family Court Motion"),[23] requesting release based on the bankruptcy filing. The family court denied her *ex parte* request but set the matter for

---

[17] ECF No. 41 of the Second Case.
[18] ECF No. 43 of the Second Case.
[19] ECF No. 57 of the Second Case.
[20] *See* Debtor's Exhibit 3, attached to the Motion for TRO at ECF No. 38.
[21] *See* ¶¶ 29-33 of the First Family Court Order.
[22] *See* pp. 7–9 of the First Family Court Order.
[23] *See* Debtor's Exhibit 1, attached to the Motion for TRO.

3

an expedited hearing and required notice to the DSO Recipient and his attorney.[24] Following a hearing on February 21, 2025, a different family court judge entered an Order denying Debtor's Family Court Motion ("Second Family Court Order"),[25] and ruled, *inter alia*, that Debtor's procedure was improper and should have been brought before the prior judge pursuant to Rule 60(b)(2) of the South Carolina Rules of Civil Procedure as a reconsideration of the First Family Court Order. The Second Family Court Order further provides that this Court should determine whether the automatic stay applies in this case and whether the mere filing of this case should result in her release.

Following the entry of the Second Family Court Order, on February 27, 2025, Debtor filed the Motion for TRO in the Current Case. The Court set an expedited hearing on the Motion for TRO for March 5, 2025, and entered an Order requiring service of the Motion for TRO and the Order upon the DSO Recipient and proof of such filed by 5:00 pm on March 4, 2025.[26] Debtor filed a Certificate of Service[27] indicating service by facsimile on DSS and Gregory Forman, P.C., and service by email on The Law Office of Tasha J. Kotz, LLC. The Motion for TRO and Order for Emergency Hearing were not served on the DSO Recipient as required by this Court's Order.

The Motion for TRO came on the heels of several other pleadings filed by the Debtor, including a Motion to Extend the Automatic Stay, filed February 11, 2025; a First Motion to Extend Time to file Schedules and Statements, also filed on February 11, 2025; and a Second Motion to Extend Time to File Schedules and Statements, filed on February 25, 2025. The Court granted Debtor's First Motion to Extend Time to File Schedules and Statements[28] but set the Second Motion to Extend Time to File Schedules and Statements for a hearing, along with the

---

[24] *See* Debtor's Exhibit 1, attached to the Motion for TRO.
[25] *See* Debtor's Exhibit 2, attached to the Motion for TRO.
[26] ECF No. 46.
[27] ECF No. 54. The Certificate of Service also reflects service on other parties unrelated to this matter.
[28] ECF No. 25.

4

Motion to Extend the Automatic Stay.[29] James Wyman, the Chapter 13 Trustee ("Trustee"), objected to the Motion to Extend the Automatic Stay.[30]

All matters were heard on March 5, 2025. Debtor, attorney Hal Cobb on behalf of the DSO Recipient and Gregory Forman, and the Trustee appeared at the hearing. Debtor was sworn and provided testimony but submitted no other evidence, although copies of family court pleadings were attached to her Motions as indicated herein. She stated that she has not filed schedules and statements because she is waiting to hear back from legal aid, needs access to her bank statements to complete her schedules, and that she feared making mistakes in her schedules absent additional support and information. Debtor also testified that the Current Case was filed to deal with her family court obligations, and that she intends to use the chapter 13 plan as a tool for repayment. Regarding notice of the Motion for TRO and the Order for Emergency Hearing to the DSO Recipient, she informed the Court that, despite this Court's order to the contrary, she intentionally omitted him from the mailing matrix as it was her understanding that the First Family Court Order requires all domestic support obligations to be paid through Mr. Forman.

Debtor testified that immediately upon release from custody she could earn $3,200 - $3,800 per month with anticipated expenses of $2,700 per month. She estimated a Chapter 13 plan payment to be about $350 - $450 per month. Through Mr. Cobb's questioning it became clear that Debtor is delinquent on her residential lease, her utilities, and possibly on state and federal tax obligations.[31] In addition, the Trustee pointed out that Mr. Forman filed a priority claim for domestic support obligations in the amount of $218,119.45.[32] Although not directly mentioned at

---

[29] ECF No. 40.
[30] ECF No. 34.
[31] The Court notes that Proof of Claim 2-1 was filed by the IRS on March 3, 2025, which claims Debtor owes a priority tax obligation pursuant to 11 U.S.C. § 507(a)(8) in the amount of $6,227.08. The Proof of Claim also reflects that Debtor's 2024 tax returns are currently outstanding, and as such, the Proof of Claim may be amended.
[32] *See* Proof of Claim 1-1.

5

the hearing, the Court notes that DSS also filed a priority claim for domestic support obligations in the amount of $4,592.82.[33] To date, priority claims in the case total $228,939.35.

At the hearing, the Court took the matter under advisement but to preserve the status quo, ordered that the time to file schedules and statements would be temporarily extended until further Order of this Court;[34] and that the automatic stay would be temporarily extended until further Order of this Court.[35] As of the date of entry of this Order, no schedules, statements, or a plan have been filed.

On March 17, 2025, Debtor filed another Motion to Extend[36], and on March 18, 2025, she filed a Motion to Enforce Automatic Stay and Request for Clarification to Family Court.[37] These filings evidence Debtor's ability to file documents: they are typed, include authorities, and were filed electronically. A review thereof indicates that they duplicate prior requests and do not include any new information for the Court to consider. On March 19, 2025, Debtor filed schedules, statements, and a plan.

## **CONCLUSIONS OF LAW**

**I.        Motion to Extend Time to File Schedules and Statements**

Debtor moved to extend the filing deadline for documents required by Bankruptcy Rule 1007(b), which details the schedules, statements, and other documents a debtor is required to file. Bankruptcy Rule 1007(c)(1) further requires the debtor to file the 1007(b) schedules, statements, and other documents "with the petition or within 14 days thereafter", with certain exceptions inapplicable here. An extension of time to file may be granted pursuant to Bankruptcy Rule 1007(c)(7), "on motion and for cause," after the movant provides required notice. As a matter of

---

[33] *See* Proof of Claim 3-1.
[34] ECF No. 58.
[35] ECF No. 59.
[36] ECF No. 70.
[37] ECF No. 72.

course, this Court granted Debtor's First Request to Extend Time and set a filing deadline of March 3, 2025. This deadline was not met. Debtor now seeks an unspecified period of time to file all required documents.

Debtor testified that she has been unable to submit schedules and statements because she is waiting to hear back from "legal aid." She indicated that her schedules and statements from prior cases would be used as a starting point, but would need to be modified, and she expressed hesitation for fear of making mistakes. She further testified that her inability to access bank statements has also prevented her from filing schedules and statements.

The Court finds these arguments unconvincing. Debtor has succeeded thus far in filing her voluntary petition, miscellaneous motions/applications, and amendments thereto all while incarcerated. Her pleadings have been comprehensive and display an ability to articulate and support her requests. Based on her demonstrated abilities, the Court finds no reason to believe Debtor could not have filed her schedules and statements, despite her incarceration, and further that she has failed to show good cause for extending the deadline. Debtor knows, based on her prior cases, the filing deadlines and the repercussions of missing them. *Kreitzer v. Household Realty Corp. (In re Kreitzer)*, 489 B.R. 698, 709 n.6 (Bankr. S.D. Ohio 2013) (noting "[w]hile a court may give a *pro se* party the benefit of the doubt in construing pleadings, allegations, and arguments, *pro se* parties nevertheless proceed at their own peril without counsel and are bound by the same rules of procedure and evidence as a party represented by counsel."). An inability to access bank statements affects only a small portion of the information required within the schedules and statements, so although this is a challenge, the Court does not feel that it was insurmountable. Accordingly, the Court denies Debtor's Second Motion to Extend Time to File Schedules and Statements, and therefore the time to file expires with entry of this Order.

II.       **Motion to Extend Stay**

Because Debtor has multiple cases pending within the last year, her stay was limited to the first 30 days of the Current Case pursuant to 11 U.S.C. § 362(c)(3)(A). She timely moved to extend the stay but must show that the Current Case was filed in good faith to obtain an extension. 11 U.S.C. § 362(c)(3)(B). By statute, Debtor triggered the trifecta of presumptions that this case was not filed in good faith: multiple cases pending within the year prior to the Current Case; one of those cases dismissed for failure to file documents; and, in this case, no evident substantial change in circumstance or reason to conclude that Debtor can either confirm or fully perform a chapter 13 plan. 11 U.S.C. § 362(c)(3)(C)(i)(I), (i)(II)(aa), (i)(II)(bb), (i)(II)(cc), (III)(bb).

Once a presumption of bad faith arises, "the debtor may only rebut this presumption by clear and convincing evidence of good faith." *In re Washington*, 443 B.R. 389, 394 (Bankr. D.S.C. 2011) (citing *In re Mark*, 336 B.R. 260, 264-65 (Bankr. D. Md. 2006)). "Clear and convincing evidence is a somewhat stringent standard, requiring a showing of proof 'beyond preponderance, but below beyond reasonable doubt.'" *Id*. (quoting *In re Mark*, 336 B.R. 260, 265 (Bankr. D.Md. 2006); *See also In re Corbin*, No. 05–90280–SD, 2006 WL 5737842, at *3 (Bankr. D. Md. Jan.19, 2006) (quoting *Jones v. Pitt County Bd. of Educ.*, 528 F.2d 414, 417 (4th Cir.1975)) ("Clear and convincing evidence 'is that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the [facts] sought to be established.'").

While the term "good faith" is not defined in the Bankruptcy Code, "[t]he tests for good faith that courts have used in other contexts, such as in considering case dismissal or plan confirmation, have also been found to apply in the context of a motion to extend the automatic stay." *In re Washington*, 443 B.R. 389, 394–95 (Bankr. D.S.C. 2011) (citing *In re Thomas*, 352 B.R. 751, 756 (Bankr. D.S.C. 2006) for its holding that "[t]he legislature's failure to define the phrase 'good faith,' leads this Court to employ the term 'good faith' with the judicial gloss that

8

has developed and evolved in other contexts."). In determining whether a chapter 13 plan is confirmable, this Court "considers the totality of the circumstances when determining whether a petition was filed in good faith. . . " *In re Moore*, 635 B.R. 451, 454 (Bankr. D.S.C. 2021). "The object of the inquiry is to determine whether or not, considering 'all militating factors,' there has been 'an abuse of the provisions, purpose, or spirit' of chapter 13 in the proposal or plan." *Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir. 1986) (quoting *Deans v. O'Donnell*, 692 F.2d 968, 972 (4th Cir. 1982)). The relevant, but non-exhaustive, factors of an inquiry into whether a debtor has filed a plan in good faith include:

> the percentage of proposed repayment, the debtor's financial situation, the period of time payment will be made, the employment history and prospects of a debtor, the nature and amount of unsecured claims, a debtor's past bankruptcy filings, the debtor's honesty in representing facts, any unusual or exceptional problems, the debtor's pre-filing conduct and the possibility of non-dischargeability in a chapter 7 proceeding . . .

*In re Pizzo*, 628 B.R. 811, 818 (Bankr. D.S.C. 2021) (citing *In re Anstett*, 383 B.R. 380, 385 (Bankr. D.S.C. 2008)).

Having determined that Debtor's case was presumptively not filed in good faith, the Court now must assess whether Debtor has presented clear and convincing evidence rebutting that presumption. *See Washington*, 443 B.R. at 394. The Court notes that this is the third petition filed by Debtor in two years and that Debtor's previous two bankruptcy cases enabled Debtor to continue multiple show cause hearings before the Family Court concerning Debtor's domestic support obligations.[38] Debtor was incarcerated pursuant to the First Family Court Order when the petition in the Current Case was filed. Under the First Family Court Order, Debtor must either serve a sentence of six months' incarceration, beginning January 15, 2025, or make a payment of $16,670.00 to purge her contempt. The First Family Court Order also stipulates that should Debtor

---

[38] *See* ¶ 8 of the First Family Court Order.

fail to purge her contempt prior to her release from incarceration, she must pay down her arrears to DSS and the DSO Recipient's attorney in payments of $1,000.00 per month. Debtor testified that she could begin working on the day she is released from incarceration and estimated that her income upon release could be as much as $3,800.00 per month; her expenses would average $2,700.00 per month, excluding any payments due and owing under the First Family Court Order; and that she could find additional work to supplement her estimated monthly earnings. Assuming these numbers are valid - which is a stretch as the Court has no sworn schedules and no documentary support regarding Debtor's ability to earn an income - Debtor has only $1,100.00 available per month to fund her Chapter 13 Plan. [39] As previously noted, priority claims to date total $228,939.35, which would require a payment significantly above her disposable income to fund any plan. Again, the Court points out that no plan has been proposed or filed.

The totality of these circumstances prevents the Court from assessing whether Debtor has sufficient income to fulfill the obligations or determine whether her financial situation has improved since her last filing. *See In re Moore*, 635 B.R. at 454; *In re Pizzo*, 628 B.R. at 818. Further, the First Family Court Order indicates that Debtor has filed the Current Case for dilatory purposes. *See In re Moss*, 633 B.R. 711, 713 (Bankr. D.S.C. 2021) (holding that the automatic stay shall not be imposed under section 362(c)(4)(B) where the debtor has filed multiple bankruptcy cases with the direct effect of delaying a foreclosure action). Therefore, the Court finds Debtor has failed to present clear and convincing evidence that the Current Case was filed in good faith. Without any clear and convincing evidence to rebut the statutory presumption of bad faith, the Court must deny Debtor's Motion to Extend Stay in this third bankruptcy case filed

---

[39] This Court has previously noted that "merely stating [one] will be employed upon his release is insufficient to establish a sufficient prospect of regular income" in the context of eligibility under 11 U.S.C. § 109(e). *Rucker*, 458 B.R. at 294 (Bankr. D.S.C. 2011). It follows that Debtor's own testimony to her employability upon release does not constitute clear and convincing evidence that this matter was filed in good faith. *See Pizzo*, 628 B.R. at 818.

10

in under two years. As such, the 30-day stay provided under section 362(c)(3)(A), and temporarily extended by Order of the Court entered March 5, 2025, will expire on the entry of this Order. As noted above, Debtor filed a Second Motion to Extend the Stay on March 17, 2025 and a Motion to Enforce the Automatic Stay and Request for Clarification to the Family Court on March 18, 2025. These requests duplicate the issues decided herein and add no new relevant information. Upon the entry of this Order, the issues raised in those Motions will become moot, as the automatic stay has expired, and will not be extended.

### III. Remaining Motions

The Debtor requests an order from this Court directing the Charleston County Family Court to release her from a civil contempt sentence based on the automatic stay and to sanction those responsible for her continued incarceration. This issue was also presented in the Second Family Court Order, which asked this Court to determine whether the automatic stay applies and whether the mere filing of this case warrants Debtor's release. Debtor's Motion for TRO uses a variety of legal terms to request equitable relief, generally, and release from custody, specifically. The Court will address each component of the requested relief in turn. The Court has determined that the automatic stay will not be extended and will expire with this Order. Therefore, there is no stay to enforce at this point, rendering any request to order another Court to release Debtor moot. However, the Court will address issues raised in Debtor's Motion.

#### a. Enforcement of the Automatic Stay

11 U.S.C. § 362(a) defines the scope of the automatic stay. Subsection (b) of the same statute sets forth exceptions from the stay and subsection (c) generally defines the duration of the stay. 11 U.S.C. §§ 362(a)(1), (b)(2), (b)(4), (c)(3), and (k)(1) are particularly salient to this case.

11

Section (a)(1) provides that the filing of a petition operates to stay:

> the commencement or continuation… of a judicial, administrative, or other action or proceeding against the debtor that has or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title….

Even when the stay is in place and has not expired pursuant to 11 U.S.C. § 362(c)(3)(A), as it has as of entry of this Order, exceptions to the stay are found in 11 U.S.C. § 362(b). Subsection (b)(4) allows for the commencement or continuation of an action or proceeding by a governmental unit to enforce the unit's police or regulatory power, including the enforcement of a judgment other than a money judgment. Subsection (b)(2) also provides for certain exceptions related to domestic matters. *See* 11 U.S.C. § 362(b)(2)(B); *see also In re Parast*, 612 B.R. 710, 718 (Bankr. D.S.C. 2020) (providing an express list of family court matters excepted from the automatic stay).

To determine whether the stay would have applied to any actions in the family court before the entry of this Order, the family court would consider whether there are applicable exceptions under 11 U.S.C. § 362(b). *In re Erhardt*, 618 B.R. 832, 841-843 (N.D.Ill. 2020) (discussing policy considerations regarding whether a contempt order is excepted under § 362(b)(4)); *Parast*, 612 B.R. at 718 (discussing the exceptions of § 362(b)(2)). The Court notes that the First Family Court Order found Debtor in civil contempt of four family court orders for failure to pay certain fees, expenses, and domestic support obligations. These monetary obligations all arose pre-petition.[40] Enforcement of a pre-petition obligation through civil contempt can in some instances be a violation of the stay. *Davis v. Blair (In re Davis),* C/A No. 17-06271-JW, Adv. Pro. No. 18-80038-JW (Bankr. D.S.C. Oct. 3, 2018). Bankruptcy courts do not have exclusive jurisdiction to determine whether the automatic stay applies; where "…the state family court heard the underlying

---

[40] *See* ¶¶ 2–15;18–21; and 33–41 of the First Family Court Order.

action, entered the contempt order, and has custody of the debtor at the time the bankruptcy case is filed, it is the best forum to decide whether the automatic stay is applicable." *In re Rucker*, 458 B.R. 287, 292 (Bankr. D.S.C. 2011) (citing *In re Gillians*, C/A No. 10–06461–JW, slip op. at 5 (Bankr. D.S.C. Nov. 17, 2010)) (internal citations omitted). Further, this Court notes that federal courts generally avoid getting entangled in domestic matters. *Id*. (citing *In re Robbins*, 964 F.2d 342, 344 (4th Cir. 1992); and *Ralph v. Overstreet*, 164 B.R. 382, 388 (Bankr. N.D. Ga. 1994)). Where the underlying matter is domestic in nature, and there are limitations on this Court to compel the release of the Debtor, the proper course of action would be for the Debtor to file a motion in an expedited manner with the family court requesting their release. *Id.* at 293. In this case, the Second Family Court Order provides Debtor with the correct procedure for raising the issue with the family court.

The First Family Court Order contains some indication that Debtor was in contempt for her conduct and courts have the inherent right to enforce their orders. *See In re Rucker*, 458 at 292; S.C. Code Ann. § 14-5-320 ("The circuit court may punish by fine or imprisonment, at the discretion of the court, all contempts of authority in any cause or hearing before the same."). Many courts have held that the automatic stay does not apply to contempt proceedings to enforce state court orders made prior to the filing of the bankruptcy, reasoning that the incarceration was not a violation of the automatic stay, but rather the act of a state court enforcing its own order. *Rucker,* 458 B.R. at 292 (citing *In re Montana*, 185 B.R. 650, 652 (Bankr. S.D. Fla. 1995), and *O'Brien v. Nachtigal (In re O'Brien)*, 153 B.R. 305, 308 (Bankr. D. Or. 1993)). The family court is best positioned to interpret its own orders, particularly in assessing whether the First Family Court Order serves to uphold that court's rights or was primarily intended to enforce a pre-petition obligation against the Debtor.

The Second Family Court Order asked this Court to determine whether the mere filing of

this case should lead to Debtor's release from incarceration for contempt. That issue may also be moot because the Court is not extending the automatic stay. For reasons stated herein, the Court finds that the mere filing does not release the Debtor. The lawfulness of Debtor's incarceration should be considered by the family court in interpreting its orders. Even if the automatic stay was still in place, the petition in and of itself is not the automatic key to a debtor's release, absent some action by the family court allowing it.

Regarding Debtor's request to sanction those responsible for her continued incarceration, 11 U.S.C. § 362(k)(1) provides bankruptcy courts with the power to award actual damages, including costs and attorneys' fees, and, where appropriate, punitive damages, where an individual is injured by a willful violation of the stay. Here, the stay in the Current Case began on the date this case was filed and not before, and its duration ends with this Order, so any relief requested by Debtor pursuant to § 362(k)(1) would be limited to that timeframe, and any issue of such damages would be squarely within this Court's jurisdiction. Currently, the record before the Court does not include sufficient information for the Court to determine that damages are due pursuant to that code section. Should Debtor wish to pursue a more limited cause of action for damages only for that timeframe, she may file an additional request.[41]

    b.    **Injunctive Relief under § 105(a)**

Debtor also seeks an injunction or other Court Order to release her from custody. She appears to rely on the Court's equitable powers to issue such an order. 11 U.S.C. § 105(a) provides that a bankruptcy court may issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of the Bankruptcy Code. When considering an injunction under § 105, this Court applies a four-factor test to determine if a preliminary injunction should be granted,

---

[41] This should not be interpreted as an indication that such relief should or should not be granted.

which requires the movant to establish: (1) that the movant is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest. *In re Chicora Life Ctr., LC*, 553 B.R. 61, 64 (Bankr. D.S.C. 2016) (citing *Winter v. Natural Res. Defense Council, Inc.,* 555 U.S. 7, 20 (2008)). "In determining whether a preliminary injunction should be granted in the bankruptcy context, this Court and other Courts interpret the 'success on the merits' factor to require the debtor to show that it has a reasonable likelihood of reorganization." *Id*. at 66. (internal citations omitted).

This Order establishes that the automatic stay is no longer in place, rendering Debtor's request for an injunction pursuant to section 105(a) moot. Even if the automatic stay were in place, the Court notes at the outset that Debtor has not demonstrated a reasonable likelihood of reorganization, and therefore fails the four-factor test. Debtor's Second Case recently failed even though she was not in custody while it was pending. In the Current Case, she faces even higher hurdles–she has no income, no insight on whether she will be released from custody, and no schedules filed in her case. Claims filed to date reveal that the brunt of Debtor's obligations are priority in nature, which are generally nondischargeable and need to be paid in full through the case. Further, Debtor testified that the impetus to filing was to repay the domestic support obligation(s), especially given her ineligibility to receive a discharge. As previously discussed, the Court is unconvinced that such a repayment is achievable.

The purpose of an injunction is to preserve the status quo and to prevent possible irreparable injury to a party pending litigation. *Rucker*, 458 B.R. at 291 (citing *Peek v. Spartanburg Reg'l Healthcare Sys.*, 367 S.C. 450, 455, 626 S.E.2d 34, 36 (S.C. Ct. App. 2005)). Preserving the status quo in this case requires Debtor to remain in place–which is to say in custody–while the issue of her contempt works its way through the family court. The Court therefore finds the request

for injunctive relief on the basis that Debtor's incarceration violates the automatic stay moot and denies the request for injunctive relief under § 105(a).[42]

    **c.**    **Writ of *Habeas Corpus***

The Court construed Debtor's Motion for TRO as one to issue a writ of *habeas corpus* and relief, through such a writ, was specifically requested by Debtor at the hearing. Again, the expiration of the automatic stay renders any argument that Debtor's incarceration is enjoined under the automatic stay moot. However, even if the question is not moot, this Court lacks jurisdiction to issue a writ of *habeas corpus*.

*Habeas corpus* is an action related to a detention or imprisonment. *Boumediene v. Bush*, 553 U.S. 723, 736 (2008). The associated writ brings the detained before the court to ensure that the imprisonment or detention is not illegal. *Id.* (*citing* Black's Law Dictionary 728 (8th ed. 2004)). The *habeas* court has the authority to order a release of someone unlawfully detained. *Gegiow v. Uhl*, 239 U.S. 3, 9 (1915), *superseded by statute on other grounds*. *Habeas* relief has deep roots in the common law but the ability of a federal court to issue such a writ is statutory.[43] *Boumediene*, 553 U.S. at 740-745 (discussing the history of the writ from Magna Carta through the ratification of the Constitution). Debtor's requested relief for release via a writ of *habeas corpus* is governed

---

[42] Debtor did not specify whether she was relying on § 105 or Fed. R. Bankr. P. 7065; however, the result would be the same but, to the extent she was relying on Rule 7065, Debtor's process was procedurally deficient.

[43] In American bankruptcy law, the authority to issue such a writ has been granted once. Section 38 of the "Act to Establish an Uniform System of Bankruptcy Throughout the United States," allowed a writ of *habeas corpus* to be issued for an arrest associated with a debt that arose prior to the bankruptcy. 2 Stat. 19 (1800) (*repealed* by Act of Dec. 19, 1803). Notably, the law recognized the authority of the court where the judgment was obtained to grant a debtor relief and issue the writ. *Id.; Kane v. Ingraham*, 2 Johns.Cas. 403, 404 (N.Y. 1801) (noting that the bankruptcy law would allow the writ to be issued if the debtor was taken into custody). This matched English practice at the time. *See* William Cooke, *A Compendious System of Bankrupt Laws* pp. cxci-cxcii (1786) (setting forth the form a bankrupt may use to petition for release for a pre-petition debt). In the Bankruptcy Reform Act of 1978, Congress passed sweeping reforms to the bankruptcy process that established this court and its jurisdiction. Among the expansive jurisdictional changes considered by Congress in establishing the bankruptcy court is the grant of *habeas corpus* authority to this Court. 28 U.S.C. § 2256 was drafted but ultimately omitted from the changes to the bankruptcy law. *See* Pub. L. No. 98-353, Title I, § 113, 98 Stat. 343; *In re Luckett*, 612 B.R. 408, 413 (Bankr. D.N.M. 2020) ("[T]he proposed statute empowering bankruptcy judges to issue writs of *habeas corpus* never became effective") (emphasis added).

by 28 U.S.C. §§ 2241(a), 2254(a).

The scope of this Court's jurisdiction is set forth in 28 U.S.C. § 1334. Subsection (a) provides original and exclusive jurisdiction to the district court over all cases under title 11. Subsection (b) provides original, but not exclusive, jurisdiction to the district court of all "civil proceedings arising under title 11, or arising in or related to cases under title 11." Cases under title 11 have been referred to this Court pursuant to the rules of the United States District Court for the District of South Carolina. Local Civ. Rule 83.IX.01 (D.S.C. 2023). Despite this referral, the bankruptcy court is not an adjunct of the district court and lacks the authority to decide matters reserved for those courts established under Article III of the Constitution. *Stern v. Marshall*, 564 U.S. 462, 486-488 (2011). Further, this Court cannot, without the consent of the parties, enter final orders in matters reserved for an Article III court. *Id*. at 482-483. Debtor's release, pursuant to a writ of *habeas corpus*, does not fall within the Court's authority under 28 U.S.C. § 1334(a). At best, the domestic action and the First Family Court Order involve a civil proceeding related to this case, for which § 1334(b) could provide this Court with nonexclusive jurisdiction, were it not for the constitutional and statutory limits discussed in *Stern*.

Moreover, the plain text of sections 2241(a) and 2254(a) limits consideration of a writ of *habeas corpus* to the Supreme Court of the United States, any justice thereof, a federal appellate circuit judge, or a federal district court. Excluded from this list are the United States Bankruptcy Court and its judges. Sections 2241(a) and 2254(a) clearly omit Bankruptcy Courts from the list of bodies that have jurisdiction to grant writs of *habeas corpus*. *In re Davis*, 352 B.R. 758, 761–62 (Bankr. D.S.C. 2006) ("'[I]n any case of statutory construction, [the] analysis begins with the language of the statute.... And where the statutory language provides a clear answer, it ends there as well.'") (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)); *In re Edmunds*, 350 B.R. 636, 642 (Bankr. D.S.C. 2006) ("The plain meaning of an unambiguous statute governs,

17

barring exceptional circumstances.") (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12 (1987)). "'Courts must give effect to every provision and word in a statute and avoid any interpretation that may render statutory terms meaningless or superfluous.'" *Edmunds*, 350 B.R. at 642 (quoting *Discover Bank v. Vaden*, 396 F.3d 366, 369 (4th Cir.2005) (internal citations omitted)). This Court's jurisdiction under 28 U.S.C. § 1334(b) cannot be interpreted as granting this Court jurisdiction to grant writs of *habeas corpus* in contradiction of the plain text of sections 2241(a) and 2254(a).

Invoking 28 U.S.C. § 1334(b) to assert jurisdiction under sections 2241(a) and 2254(a)—solely because § 1334(b) permits this Court to consider matters related to a case pending under Title 11—would also be unconstitutional under *Stern*. As a result, even if § 1334(b) could be interpreted so broadly, this Court would lack the authority to issue the writ. *See, e.g., Bollman*, 8 U.S. at 14 (holding that any grant of authority to issue a writ of *habeas corpus* must be compatible with the Constitution); *I.N.S. v. St. Cyr*, 533 U.S. 289, 304-305 (2001) (holding issues regarding a writ of *habeas corpus* could be answered by a common law judge in 1789); *Stern*, 564 U.S. at 484 (citing *Northern Pipeline* and holding when traditional actions of common law, which could have been tried at the courts of Westminster in 1789, are within the bounds of federal jurisdiction and the responsibility for deciding those matters rest with Article III judges in Article III courts).

The issue of Debtor's release from prison is entangled with the prior issue of the application and extent of the stay and the interpretation of the First Family Court Order. While the expiration of the stay moots the question of whether the automatic stay requires the Court to issue a writ of *habeas corpus*, this Court has previously expressed doubt as to its authority to order the release of a debtor for prepetition civil contempt. *Rucker*, 458 B.R. at 292-293. Those doubts were confirmed by the Supreme Court's subsequent decision in *Stern v. Marshall,* 564 U.S. 462, 482 (2011) (holding that Bankruptcy Courts lack constitutional authority to enter a final judgment on certain

matters). To the extent that the Motion for TRO asks the Court to issue a writ of *habeas corpus*, that request is denied.

## **CONCLUSION**

Debtor finds herself in a predicament—unable to pay the contempt sanction or fund a plan in this case because the contempt itself has deprived her of the ability to earn. While sympathetic to Debtor's plight, this Court must follow the law. Accordingly,

1. Debtor's Second Motion to Extend Time to File Schedules and Statements is denied.

2. Debtor's Motion to Extend the Automatic Stay, the subsequent Motion to Extend Automatic Stay, and the Motion to Enforce Automatic Stay and Request for Clarification to Family Court are denied, and to the extent the automatic stay of any action was applicable, the stay expires with entry of this Order.

3. Any request for relief pursuant to 11 U.S.C. 362(k) is denied without prejudice, consistent with the terms of this Order.

4. All remaining requested relief is denied, without prejudice to Debtor's rights to raise any issues regarding her release from incarceration or reconsideration of orders of another court in the proper forum.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**03/20/2025**



*s/ Jefferson Davis IV*
US Bankruptcy Judge
District of South Carolina

Entered: 03/20/2025

19